Let's see, our next case for argument is Levitte v. Google. The same concern about briefs having been filed under seal in this case, if I'm not mistaken, is that right? You'll have to ask. Okay. As I said, my name is Miranda Colby. I represent the plaintiffs' appellants in this matter. And we are here today because the district court denied class certification. I would like to reserve three minutes for rebuttal. Although the district court held that liability could be determined on a common basis, it denied class certification on the sole ground that it found individual issues related to the calculation of restitution. This was legal error for two independent reasons. First, the district court failed to follow Ninth Circuit precedent holding that individual issues related to the calculation of damages, or in this case restitution, do not, cannot by themselves defeat class certification. Second, the district court's reason for rejecting plaintiff's proposed method of calculating restitution misapplied California law and therefore constitutes an abuse of discretion. Let me start with the first reason the district court got it wrong. As we explain in our briefs, the district court disregarded Yokoyama's holding that when liability can be proven on a common basis, individual issues related to the calculation of damages do not preclude class certification in this circuit. Instead, referring to dicta contained in the footnote in a First Circuit case, the district court implicitly limited Yokoyama's holding to cases where the calculation of damages would be a relatively straightforward matter, i.e., virtually a mechanical task. That reading of Yokoyama cannot be squared with the facts of the case itself. As I'm sure you are aware, the claim in Yokoyama was that the defendants had deceptively marketed annuities as being appropriate for seniors. In order to calculate damages in that case, one would have to look at an array of individual factors, including things like what was each class member's own financial situation? What were their financial goals? What ages were they? How old were they when they began the annuity? What interest rate did they get? Did that interest rate change? Did the annuity terminate? So on and so forth. These individual issues were far more complex than the issues that are present here. Furthermore, let me just get to the concerns that have been raised. Thoughts on those issues. There's an argument that Comcast somehow or other calls into question. Well, I would respond first that the Ninth Circuit has twice said no. In both the Leyva case and then again in the Jimenez v. Allstate case, the Ninth Circuit has said that Comcast should not be read to require that as a prerequisite to class certification, the plaintiffs must provide a common method of calculating damages. To the contrary, in both of those cases, the Ninth Circuit has reaffirmed the long-standing rules set forth in Yokoyama. There's a second independent basis for reversal here. The district court misapplied California law when it rejected the plaintiff's proposed method of calculating restitution. Plaintiffs proposed using the out-of-pocket loss method of calculating restitution here. That means that we would add up all of the charges that Google charged to the class members when it deceptively sold them Park Domain advertising, and then we would subtract from those charges the estimated market value of Google's advertising service using Google's own smart pricing method. Google's chief economist, Hal Varian, defines smart pricing as a way to reset advertisers' bids to the same levels that a rational advertiser would set them to itself if it had sufficient data about the performance of each site on which ads show. This is the very definition of market value. Furthermore, Google's person most knowledgeable regarding smart pricing testified at deposition that Google has sufficiently robust data regarding how well ads have performed in its system on particular publisher sites that it can generally estimate the market value of advertising on those sites to a 95% degree of certainty. The district court didn't reject plaintiff's proposed method of calculating restitution based on qualms that it had with respect to smart pricing per set. The real problem that the district court had was that we were applying the out-of-pocket loss method of calculating restitution, and the district court felt that it would be inappropriate to award class members their out-of-pocket losses if they had profited from advertising on Park Domains. According to the district court, smart pricing method was too inexact because it would award restitution to all class members who suffered out-of-pocket losses regardless of whether they had profited from the service. What's wrong with that determination? There's two things wrong with that. First, there can't be any doubt that under California law it is absolutely appropriate to use the out-of-pocket loss method to calculate restitution in this UCL case. Colgan v. Leatherman is the leading California case on how to measure restitution in UCL cases involving deception. And in Colgan, the court said, look to the Civil Code Section 3343. Look to the out-of-pocket loss method there. That's a perfectly viable way of calculating restitution. Furthermore, even if that wasn't enough, which we think it is, one can also look to the restatement of restitution. And the calculation, if you look at the restatement of restitution, is exactly the same. Section 150 says that when someone has obtained money from the other by fraud, the victim is entitled to receive that money back. That's the price paid. Section 152 says, but Google here can get an offset of the out-of-pocket loss. That market value is determined by the fair market value and not by any specific benefit provided to the victim. So, again, same measure, whether you apply Civil Code 3343 or the restatement, the result is the plaintiff gets the out-of-pocket loss. There is simply no authority for the district court's position that class members' out-of-pocket losses should be further reduced when class members earn profits from park domain advertising. Just as there's no authority for the idea that their restitution should be increased if they receive no benefit at all. What they were given was a service. And there is no authority, not the UCL itself, not the Civil Code, not the Statement, not the common law, that would allow the perpetrator of the fraud here to retain more than the market value of the service that it fraudulently sold to the victim. There's a second reason why the district court's conclusion is wrong. The district court was essentially applying the same benefit of the bargain analysis that the California Supreme Court rejected in the Kwikset case in which the Ninth Circuit recognized in the Enojos v. Coles case that we provided to this Court. In Kwikset, the appellate court reasoned that consumers who purchased lock sets falsely advertised as having been made in the USA had suffered no loss because they had received fully functioning lock sets. Similarly, here, the district court believes that when class members received park domain advertising that functioned just as well as content or search advertising might have functioned, that they suffered no loss. They suffered no harm, and therefore, they're not entitled to receive restitution. Well, Kwikset said, no, that argument does not fly in California. The Kwikset held as a matter of law that when a product is sold by means of misrepresentation, the purchaser has not received the benefit of the bargain. The economic harm, the loss of real dollars from a consumer's pocket, is the same, whether or not a court might objectively view the products as being functionally equivalent. In fact, the only exception to this rule where the benefit of the bargain defense doesn't apply is where the misrepresentations at issue were immaterial. Now, there can't be any serious argument that the misrepresentations here were immaterial because, first, immateriality is an objective test under California law, and, two, the way that that test — one way that materiality can be tested is by looking at whether the defendant, here Google, had reason to believe that the purchasers were likely to consider the misrepresentation to be important to their purchasing decisions. Remember, here, Google engaged in a purposeful, intentional fraud. It engaged in this fraud specifically because it knew that advertisers didn't want their ads to appear on sites that they and Google's own employees considered to be illegitimate, shady, spammy, garbage websites. Google itself — normally, all of the websites that do business with Google are going to put ads on their pages. In contrast, Google specifically prohibited all of the owners of all of the park domains with which it did business from putting anything on those pages that would associate them with Google. Why? One, Google feared that if advertisers saw that, they would realize the kinds of sites that Google was going to be putting their ads on when they were selecting to be put on search or content sites, and it feared that they would leave the Google network in droves. Second, Google feared that its own harm would be hurt by association with these illegitimate pages. I'd like to reserve the remainder of my time for rebuttal. Sure. Good morning, Your Honors. Michael Rhodes on behalf of Google. I'd like to answer the Court's question. The legal error that made Comcast get to the Supreme Court was characterized as follows by the Supreme Court itself. The Third Circuit refused to allow the District Court to wade into the proposed methodology for determining class-wide injury and class-wide damage awards. The Third Circuit said that would be an attack on the methodology which has no place in the class certification process. And as you recall, the Comcast Supreme Court decision says we reject that logic. You have to wade into the merits enough to determine whether or not common or individual issues will predominate. And in a case like this and like in Comcast, that requires the trial court to understand what the plaintiff's proposed method is going to be of determining who was harmed and if they were harmed in what amount. So my concern, though, was so we made it pretty clear in Yokoyama and in subsequent cases that have followed Yokoyama. Blackie came before Yokoyama. But we made it pretty clear that just because you're going to have to deal with individual, some individual calculation of damages, that by itself does not make class-wide treatment. And I would generally accept that proposition, Your Honor, although I would note in all of those cases, there is also sort of an observation almost as an aside that there may be a case out there where. There may be a case. There was a subsequent case that we had, Mazda, I think, versus Honda Motor, where they said, where the panel said that where customers had seen different, they may not have seen all the same. They didn't get the presumption of reliance and so forth. Right. But that's not what's going on in this case. And that's why we're talking past each other. This is not a situation where Judge Davila said, oh, I'm down in the last part of the analysis. And all that's left for me to figure out is who gets what. And that's too individualized. That's not what he said in his order. And he clarifies that in his motion for reconsideration order. He says the plaintiffs are reading too much into my order. What I was struggling with is I took the plaintiff's model and I tried to apply it to the evidence. I made a bunch of factual findings. I went through all three of their proposed discount models and I found as a factual matter that they did not do what they said they did across the class. And he didn't hold them to a perfect standard. He said it doesn't have to be exact. It's just whether it's a reasonable formula for discerning whether or not the class has been injured and in what way. And it was all based on the evidence of this case. So why isn't this smart? Is it smart pricing? Yes, Your Honor. Formula or standard. Why doesn't that adequately match up with the theory? It has nothing to do with park domains and air pages. It is a way for Google to tell its advertisers that if you place an ad across our spectrum, you've got search and you've got display. Basically, search is you type in something and an ad matches your search query. And display is if you've gone to the New York Times website, let's say, and they've got a Google, they serve ads from Google, you might see ads there. Smart pricing simply says we're aware that some pages in the content network don't result in as good of conversions for the advertiser. So we'll just try to account for that and we'll just reduce your bid across the spectrum. In Comcast, they made a very important point. You have to link your theory of liability to your theory of class-wide harm. They accentuate that throughout the opinion. And that's what Judge Davila did here. He said, let's take a look at what your theory of liability is. And that's found in the Third Amendment complaint, paragraphs 119, 125, and 135. And there, what the plaintiff said is, we paid too much for clicks on ads placed on park domains and error pages than what they were worth. So Judge Davila said, okay, tell me how I will determine that, because I need to figure out who's entitled to restitution and who's not. And when I figure out who is, what will they get? When he applied their formula, what he found was lots of false positives, right? He found that some people didn't pay more than they should have for those ads because the ads performed better than the benchmark of the unaccused places within the network. That's a factual finding based on their methodology. I don't think this is a grandiose case involving the principal at Yokoyama that they keep parroting through the record. I generally agree with that assertion, that if that's all you've got is a mechanical difference in application of individual damage awards, sure. That's not enough to overcome class cert. But that's not what they – what's going on here. Look at the responding brief at pages 2 and 3 and the parenthetical. It starts at the bottom of 1 and goes on to page 2. What they say to you is they've adopted a pretty radical position. What they want you to say is the district court is not even entitled to consider who gets restitution as part of the class. They say that explicitly. And what he said was I'm not down in the weeds trying to figure out what Judge Quist gets or what Judge Tashima gets in terms of the award. I'm trying to figure out who in this class is even entitled to restitution. You gave me three formulas. I ran the traps on those just like Comcast instructs me to do. I didn't decide the merits of them. I just decided when I ran those formulas based on the evidence and the record of this case, which he called, by the way, is the unusual fact pattern here, including but not limited to the fact that the price itself is so variable that you could take out actors of the auctions and get to the same place. His conclusion was simply I think it's too inexact, and I can't determine who's even entitled to restitution, who's even been harmed, let alone what the amount will be based on the formulas that you gave me. And that's where I think the case ends for them. That's a fact determination. And even under Yokoyama, the beginning of that case, fact determinations like that are entitled to deference. And that's really what we're arguing about here. This case really is just a B-3 case about whether or not he committed error in the manner in which he tested their methodologies. And I would submit to you that if you walk through the dogma of Comcast, and I would point out, Your Honor, even Comcast says, and I'll quote, questions of individual damage calculations will inevitably overwhelm questions common to the class. So even there — In that case. Yes, in that case. And that's what I'm saying. Comcast. Not in every case, but — He's pretty clear about that. I agree with you. Justice Scalia is pretty clear about that. He says that the dissenters are going — Yeah. — you know, overboard. Right. Exactly. And I'm not saying that that's — I'm not saying that Yokoyama's bad law. What I'm saying is, in this case, based on this record, based on the analysis, the analytic framework that Comcast gave Judge Dabla, he did exactly what he was supposed to do, and he gave his reasons for it. He explained what the evidentiary problems were. Well, if — so if they prove up, you know, their — they establish — let's assume for a moment that they are able to establish liability on statutes. Which would be that there was a misleading statement about the placement of these ads. That's their theory. Placement of these ads. Correct. Okay. So then — then they're entitled to recover restitution. But what's interesting, again, go back to the Third Amendment complaint and see how they themselves framed what they are seeking. They're seeking to recover the difference between the price per click they paid and what they say is the market value. And so Judge Dabla went off and said, okay, I have to now figure the but-for price. The problem is, on this record, based on how pricing determinations are made, how interactive they are, how they're auction-dependent, the price is not like in Yokoyama where you have a single price for an annuity and you have a single brochure, but rather you have all of this variability that's interacting. Well, you have a number of variables in Yokoyama as well. But the record was different, Your Honor. In here, you could take away the most expensive bid, as we demonstrated in Hal Varian's declaration, and you could have the exact same price for everybody else, even assuming the curative disclosures have been made and it has scared off a chunk of the market. And we said, let's assume it's scared off the most important part of the market, the people who bid the most. It may not change the pricing. So there was a — there's sort of a theoretical problem with their analysis. Secondarily, he looked at actual data from the named representative plaintiffs. R.K. West, this is Exhibits 16 and 17 of the rebuttal report of our expert, showed that cost per clicks for ads on park domains and air pages was less than the benchmark, the unaccused pages, and the value of those ads, the conversion percentages, the conversion rates, and the cost per conversion was lower than the benchmark. So he said, well, your entire theory then is sort of factually wrong. The predicates to your theory don't work. I would submit that under Comcast, he did what he was exposed to do in weighing the methodology. He didn't go so far as to decide it like Amgen says you're not supposed to, but he did, in fact, get into the methodologies that he was given, and based on the unique record before him, he made a variety of factual conclusions. Then what happened was the plaintiffs said, we don't think you heard us. We don't think you actually considered our three models. So they filed a motion for reconsideration. And he clarified. He said, no, you're wrong. And if you look at his order, he says that he considered all three of them and made a factual determination that they didn't yield the result that they were being offered for. Again, that is a finding of fact that's entitled to deference on appeal. And really what there are – excuse me, Your Honor. No, go ahead. No, please. Well, I thought that the appellant said that it's a simple matter of restitution. You pay the money to Google, you want it back because it's based on fraudulent representations as to what's going to be done. They started there, Your Honor. They did start there, but they gave up that model. And what happened was they changed the theory throughout the case. I thought she said that while she was here. Well, she didn't answer that. They had three models of damages that they proposed to court. They really didn't do anything. If it is pure restitution, you would agree that's pretty easy to determine. Well, no, not in the – I would argue two things. One is that's not what this case is about. I think I've said my piece on that. Right. Secondly, I do think this is the one case when you look at the unique facts of how these things are priced, the purpose for which the advertisers are placing the ads, the performance of them, that if we look at restitution and look at that Korea supply case from the California Supreme Court where they make the point that restitution is an equitable claim and, therefore, the court is entitled to look at the totality of the circumstances in deciding individual restitutionary awards, I think Judge Gable made the correct factual finding here that doing it their way is going to award restitution to people that were not injured at all. And they started the case out exactly as you suggested. They wanted all of the money back. They said we call it the full price, the full refund methodology. They gave up on that, and they glommed on to smart pricing. Remember, Comcast says you have to link the theory of liability to your proposed model of class-wide harm and injury. Their theory of liability is specified in the Third Amendment complaint. Smart pricing has nothing to do with the value of clicks on park domains and air pages. Moreover, the very park domains and air pages they're complaining about are probably within the ambit of already have been smart priced. They never identified the but-for price. They never identify how we are going to use the data that we got to determine the value of clicks on park domains and air pages. And in their brief, they make allusions to aggregate expectations as sort of the solution, the class as a whole. But there is a paucity of record evidence. They never offered any survey evidence or any consumer evidence to show what people thought. They didn't do that. So at the end of the day, we have three proposed formulas, considered and weighed by the district court twice on the original motion and the motion reconsideration and rejected factually for showing too many individual issues over common issues. That's entitled to deference. Thank you. Any further questions? Thank you. I'd be happy to answer any questions that you might have, but I wanted to address the idea that our Did I misstate your argument up here that you're looking for restitution? That is correct. We are seeking restitution. How do you measure that? We measure restitution, again, by starting with the price paid. At the time of purchase. At the time of purchase. And then subtracting the smart priced market value of that click. Basically, smart pricing determines the market value on a click-by-click basis. It looks at information regarding how well advertisers have done on that particular website, just like on a billboard. You know, you're determining the market value of advertising on a billboard by looking at where is that billboard located? Is it on Fifth Avenue or is it on Skid Row? Are people looking at that billboard? Are we going to be able to sell our products? You know, if we advertise on that billboard. And Google says, well, when you advertise with us, you don't know in advance what billboard you're going to be put on. And so smart pricing adjusts the price for you to the market level. And it's doing it in time. So the smart price value of advertising on a particular website might be one thing today, and it might be another thing a few weeks from now because it looks at historical data and that the history is continuing to change. So it's remarkably precise. It's very up-to-date. And it's very narrowly tailored. And as we said, Google's own person who was knowledgeable regarding smart pricing said, we have sufficiently robust data that we can calculate that essentially market value up to a 95% degree of certainty most of the time. So Judge Davila also said that in determining restitution, you have to take account of value, some value that they receive. Right. And we absolutely agree with that. The idea is that the plaintiffs are entitled to receive all of their money back, minus the value that they obtain from the service. Where the parties differ is how that value is measured. And again, the civil code, the restatement of restitution, every source of authority we've looked at says you measure that value by the market value at the time the transaction occurred. I mean, interestingly, Google cited, and I think misleadingly cited, Section 151 of the restatement in its brief. That section deals with when someone has tortuously acquired property, and the property has increased in value subsequently. This is one. This case doesn't involve property, so you should be looking at Section 152, not Section 150. And second, the what that, what that, what Section 151 is doing is saying the victim of the fraud is entitled to an increased protection if the value of the property that was taken by them, from them tortuously, has gone up in the interim. They should get the value of that increase. It's not saying that the perpetrator of the fraud deserves some enhanced protection if the value has gone down. It was one other concern that Judge Davila raised, and that was that, well, there's an option, auction bid is various for all the purchasers. Sure. It's a free market. Right. And so at any moment in time, the bids are coming in, and the bids, you're bidding to go on a website based on a keyword. So it's not like if I'm advertising coffee and you're advertising soup, we're going to end up on the same page. Basically, all the coffee people are going to end up on the same page, buying to get on that page. And what smart pricing does is it adjusts those bids to the market value of those bids at the time. So, for example, the top bidder to get on the site might pay a buck. The second bidder might pay $0.95. The third bidder might pay $0.90 for that click. What smart pricing does is it looks at the historical success of advertisers on that site, and it says, well, they did about 25% worse than advertisers did on our benchmark site. And so rather than paying $1, $0.95, $0.90, we'll reduce all that by 25%. When you say the word worse, who determines that? So Google gathers data from its advertisers called conversion data, and they feed that data back to Google showing whether a click resulted in a beneficial business result. Correct. And, again, Google says this data is sufficiently robust that we can confidently predict the market value to a 95% degree of certainty. And, in fact, it tells the public, because of that, go ahead and bid the maximum, because our smart pricing system is going to reduce those bids for you to no more than the market value. Okay. Thank you for your time. Thank you very much. We appreciate your arguments. Interesting case, and the matter is submitted.
judges: Quist, Tashima, Paez